**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re                                                    Case No. 8:12-bk-15725-KRM
                                                         Chapter 11
BAMBI ALICIA HERRERA-EDWARDS,

      Debtor.

_____/

BAMBI ALICIA HERRERA-EDWARDS,

      Plaintiff/
      Counter-Defendant,

vs.                                                      Adv. No. 8:14-ap-247-KRM

ERIC MOORE,

      Defendant/
      Counter-Claimant.

_____/

**MEMORANDUM OPINION ON**
**OBJECTIONS TO CLAIMS FILED BY ERIC L. MOORE**

      Since 1997, the debtor, Bambi Alicia Herrera-Edwards ("Herrera-Edwards" or "debtor")

has received royalty income derived from the music compositions of her late husband, Bernard

Edwards.  In this adversary proceeding, she is challenging claims filed by Eric L. Moore, who

holds himself out as a "treasure hunter" of artists' royalties.[1]  He has filed multiple claims in this

case (the latest being Claim No. 18) and a counterclaim in this adversary proceeding, seeking up

to $10 million from the debtor's royalty income, for alleged services under a pre-petition

---

[1]  Mr. Moore was represented at different times in this case by separate attorneys, both of whom withdrew (Doc.
Nos. 193, 371).  As a result, Mr. Moore represented himself in this proceeding.  He did so with remarkable skill.

Consulting Agreement.[2]  Alternatively, he makes the same claim, as an administrative expense or for *quantum meruit,* for providing post-petition services to the debtor's bankruptcy estate.

Herrera-Edwards contends that the Consulting Agreement was procured by fraud and that Moore, a convicted felon, did not discover anything she did not already own or that her lawyers were not already working to recover.  She argues that he is ineligible for an administrative expense claim because his employment was never approved by the court.  She asks that Moore be made to repay about $45,000, a payment he received as compensation under the Consulting Agreement shortly before the Chapter 11.  After hearing testimony over 6 days, considering the documentary evidence, and post-trial briefs, the Court is compelled to conclude that the debtor's objections should be sustained, Mr. Moore's claims should be disallowed, judgment should be entered on all counts for plaintiff, and judgment entered against Mr. Moore on his counterclaim.

<u>BACKGROUND FACTS</u>

Herrera-Edwards is currently employed as an airline flight attendant.  At one time, however, she was married to the late Bernard Edwards, a co-founder – along with the debtor's cousin, Nile Rodgers – of the American disco/funk band *Chic*.  Together, Mr. Edwards and Mr. Rodgers authored and performed many popular songs including "*Le Freak*," "*We are Family*," "*Dance, Dance, Dance,*" and "*Gettin' Jiggy with It*."

---

[2]  The Chapter 11 petition was filed on October 17, 2012.  All of Mr. Moore's initial claims (Claims 14 and 15 - each in the amount of $1,360,000 - and 16 - in the amount of $10,203,519.09) were filed after the claims bar date, December 31, 2012.  The debtor objected to the untimely filed proofs of claim and the Court sustained the objections.  (Doc. No. 267).  Mr. Moore hired Attorney Christopher Todd to file a motion for reconsideration of that order.  (Doc. No. 274).  On July 7, 2013, Mr. Moore filed a Motion for Payment of Administrative Expenses, in the amount of $2,720,000, accusing debtor's bankruptcy counsel of bad faith.  (Doc. Nos. 188, 274).  The debtor was then compelled to employ special counsel to represent her and file this adversary proceeding to contest Mr. Moore's claims and applications for payment.  (Doc. Nos. 336, 354).  With the consent of the debtor, Moore was allowed to file a final, all-in claim, which he did.  His Claim No. 18, at issue here, amends prior proofs of claim and requests for administrative expenses.  (Doc. No. 355).

Mr. Edwards died in 1996.  His share of the music copyrights was included in his estate, which was probated in Connecticut.  The debtor asserted substantial tort claims against the probate estate, but settled them in 1997 in exchange for a 37.5% interest in Edwards' copyrights.

Since 1997, Herrera-Edwards has received royalty payments from an intermediary, Jess S. Morgan & Co., Inc. ("JSM").[3]  The royalty income flows through several levels of payors – from ASCAP to Warner/Chappel Music ("Warner/Chappel") to JSM, each of which takes a fee before disbursing.[4]  It was not until the fall of 2010, after comparing her royalty payments to those of her cousin, that Herrera-Edwards came to suspect that she had been underpaid for years. (7/15 Tr. pp. 15-16).[5]

Between 2010 and September 2012, the debtor hired various lawyers, accountants, and financial advisers to resolve her debts and recover the suspected royalty underpayments.  By this time, she had accrued a substantial federal income tax debt and attempted to borrow against her royalty income to resolve it.  In the midst of these difficulties, Mr. Moore came to be involved in her financial affairs.

1.      The Debtor's Copyright Interests.

On July 9, 1997, Edwards' probate estate and its beneficiaries settled substantial tort claims filed by Herrera-Edwards.[6]  Initially, the parties executed a hand-written mediation settlement agreement, dated July 9, 1997.  They executed a more detailed agreement on July 30,

---

[3]  JSM was Bernard Edwards' financial management firm.  One of JSM's founders, Wallace Franson, was the executor of Bernard Edwards' estate.

[4]  Warner/Chappel takes a 10% fee.  JSM takes a 5% fee.

[5]  Since Nile Rodgers and Bernard Edwards had equal 50%/50% shares to their compositions, a rough estimate of the magnitude of any underpayment would appear to be the difference, since 1997, between 37.5% of what Rodgers received and what the debtor actually received.

[6]  The parties were Mr. Edwards' children, the late Alexis Edwards (Mr. Edwards' first wife), and the debtor.

1997.  (Pl.'s Ex. 5).  The same day, the probate court held a hearing on the settlement.  (Pl.'s Ex. 3).  The fully executed July 30, 1997 Agreement was filed under seal in the probate case on August 28, 1997.  (Pl.'s Ex. 5).

Herrera-Edwards and Edwards' probate estate later entered into another agreement, dated August 21, 1997, referred to as the "Co-Publishing Agreement."  (Pl.'s Ex. 6).  The Co-Publishing Agreement provided for (a) the sale and assignment to Herrera-Edwards of 37.5% of all of the probate estate's right, title, and interest in the Edwards' compositions and copyrights; and (b) her relinquishment to the probate estate of "administration rights" to the copyrights.[7]

It appears that the two settlement agreements and the Co-Publishing Agreement were parts of a single settlement transaction.[8]  As a result, Herrera-Edwards received an outright ownership interest (except for administration rights) in 37.5% of the copyrights owned by the Edwards estate.  All parties to these three 1997 agreements were represented by counsel.  This 37.5% ownership in Edwards' copyrights is the principal asset in this Chapter 11 case.

To address his cousin's suspicions of underpayment, Nile Rodgers arranged for her to consult with Richard Leher, a highly regarded entertainment attorney with Greenberg Traurig LLP, in Los Angeles, and Michael Ostin, a music executive.  (7/15 Tr. pp. 16-17).  In the fall of 2010, they reviewed Herrera-Edwards' royalty statements and the probate settlement documents. They concluded that her payments did not seem to reflect her full royalty rights.  (5/22 Tr. pp.

---

[7]  Where the author, like Bernard Edwards, is both a songwriter and performer, there are copyrights for the compositions and for recorded performances.  Thus, Edwards' copyrights would include performance royalties, mechanical royalties for records, CD's and streaming play; artistic royalties; and synchronization royalties (for use of a work within another work).  A single artist, as owner of these rights, would also have "administration rights," with authority to give permissions for exploitation of the rights and the right to sell or assign the rights included in the copyrights.

[8]  The July 9, 1997, mediation settlement agreement provides, in paragraph 9, that "*The Estate by its Executor Wallace Franson, Bambi Edwards, Alexis Edwards and Bernard Edwards' children agree to execute such documents, contracts and agreements as are necessary to effectuate the terms and conditions of this Stipulation.*"

184-86, 188-90; 7/15 Tr. p. 17).  They believed that she had not been receiving "record," "artist," or "producer" royalties.  (5/22 Tr. pp. 188-90).

Instead of hiring Mr. Leher, who commanded a premium billing rate, Herrera-Edwards selected Morgan & Morgan, P.A., who agreed to work on a 40% contingency fee to recover the unpaid royalties.[9]  (5/23 Tr. pp. 22-24).  She provided Daryl Rouson, Tucker Byrd, and Clay Townsend at Morgan & Morgan with all of the probate documents.  (5/23 Tr. p. 24).  After review and analysis of the documents over several months, the Morgan & Morgan lawyers prepared a draft complaint to recover the unpaid royalties.  (5/23 Tr. p. 28).

> 2.    Mr. Moore Becomes Interested in the Debtor's Financial Affairs.

In late 2010, Herrera-Edwards needed funds.  Marvin Washington, Herrera-Edwards' investment advisor, suggested that she pursue a loan.  Washington introduced her to Chuck Biddle, who had a connection to a lender, Music Royalty Consulting, Inc. ("MRCI").  (7/15 Tr. p. 20).  Biddle brought in his associate, Mr. Moore, to help him and Washington close a loan.[10] (5/22 Tr. p. 44).

Without her knowledge, Washington sent Biddle and Moore copies of Herrera-Edwards' documents.  (7/15 Tr. pp. 20-22; Pl's Exs. 9, 10).  Washington told Herrera-Edwards that Moore was considered a "closer" and that Biddle had contacted Moore for assistance so that Moore could help Biddle close a deal with MRCI.  (7/15 Tr. p. 26).  Although he and Herrera-Edwards did not meet until July 2012, Moore began gathering information about her and her royalty rights.  (Pl.'s Exs. 10, 14; 7/15 Tr.  pp. 20-24).  But, this initial effort to borrow funds stalled.

---

[9]  Herrera –Edwards retained Morgan & Morgan on November 24, 2010.  (Def.'s Ex. 39).

[10]  Moore disputes the characterization that he and Biddle were partners, in the sense that they have no written contract.  But, they did call each other "partner" as a term of endearment.  (5/22, Tr. p. 40).  When asked whether Moore had put in writing in an email that he had an oral fee sharing agreement with Mr. Biddle, Moore responded that he knew that he had an oral agreement with Mr. Biddle.  (5/22 Tr. pp. 85-86).

The debtor resumed discussions with MRCI in 2011, without the direct involvement of Moore. On June 28, 2011, she executed an agreement with MRCI to obtain about $1.8 million secured by a lien on her royalty income, to be released only after MRCI had received $3.6 million.[11] She executed an assignment of her rights; but, JSM and Bernard Edwards Co., LLC ("BEC"), as administrator and co-beneficiary of the copyrights, respectively, refused to consent to the assignment.[12] (7/15 Tr. pp. 27-28). As a result, MRCI never made the loan.

Instead, MRCI sued JSM and BEC in California state court for interfering with the Herrera-Edwards deal. (5/22 Tr. p. 192). Initially, the claims were dismissed, but MRCI repled one claim and added Herrera-Edwards as a defendant. (5/22 Tr. pp. 192-93). In response to MRCI's lawsuit, ASCAP began withholding (in escrow) the royalty payments that were due to the debtor. Herrera-Edwards then retained Attorney Leher to represent her in the lawsuit. (5/22 Tr. p. 192).

The royalties withheld by ASCAP had grown to about $265,000 by June 2012. That's when Herrera-Edwards informed her attorney in the MRCI transaction, Mr. Minter, that her "money ran out." (Pl.'s Ex. 34).

3.    The Consulting Agreement.

On June 24, 2012, Mr. Minter informed Herrera-Edwards by email that Chuck Biddle claimed that "he and Moore" had found new money for her to collect.[13] (Pl's Ex. 34). That is the same claim that Moore had made directly to Attorney Minter in January 2012, when Moore told Minter that he had "discovered" over $500,000 that he could recover for Herrera-Edwards

---

[11] The debtor was represented in this transaction by Atlanta attorney Kendall Minter. Minter was to receive about $92,000 from the loan proceeds, $45,000 of which the debtor paid to him in advance.

[12] BEC is an entity owned by Bernard Edwards' children.

[13] The June 24, 2012, email from Minter to Herrera-Edwards says: "Let's talk today or tomorrow. I got a call yesterday from Chuck Biddle about $$ outside of [MRCI] and [JSM] that he and Eric have located that you can collect." (Pl.'s Ex. 34).

in seven to fourteen days.  (Pl.'s Exs. 29, 31).  Although they were not partners in any formal

business, Moore and Biddle were acting in concert.  The week following June 24, Moore

obtained from MRCI copies of the Morgan & Morgan draft complaints, which outlined the

rights, parties, and avenues of recovery that Herrera-Edwards should pursue.  (Pl.'s Ex. 37a).

    In his subsequent conversations with Herrera-Edwards, Moore referred generally to

funds that he had located, describing them as "hidden" or "misappropriated."  (7/15 Tr. p. 34;

7/28 Tr. pp. 22-23).  He assured her that he had located money other than what she had

historically received since 1997 (7/28 Tr. pp. 22-23; 7/15 Tr. pp. 35, 39); but, he did not

reveal the sources.  (7/28 Tr. p. 22).  In addition to claiming a quick recovery of $500,000 or

more, Moore touted his work with high profile clients.  (7/15 Tr. p. 42).

    What he did not tell Herrera-Edwards was that he had been convicted of grand larceny

in 1999 for taking investor money under the false pretense that their funds would be invested in

the promotion of a *Prince* concert.  (7/15 Tr. p. 43; Doc. 15, Answer ¶ 74, n.1, Ex. B (attaching

articles describing the crime)).  Moore also did not disclose that he had an oral agreement with

MRCI to receive 50% of any royalty payments that he was able to recover for MRCI through its

lawsuit against JSM and BEC.  (Pl.'s Ex. 60).

    Ultimately, Moore gained the debtor's confidence.  Unlike others, Moore took time to

sit down and explain the documents to her, line by line.  (7/15 Tr. p. 61, 117).  To her, Moore

was a like a "security blanket."  (7/15 Tr. p. 63).  He convinced her that he had found

"treasure" that her attorneys had been unable to collect.  (7/28 Tr. pp. 51-52).  With her

historical royalty payments being withheld because of the MRCI litigation, Herrera-Edwards

was led to sign the Consulting Agreement, dated July 11, 2012, because of Moore's

representations that he had "found" new money.  (7/15 Tr. p. 33; Pl.'s Ex. 38).

The Consulting Agreement includes three bases of compensation for Moore: (a) 17% of the funds or tangible liquid property recovered as a direct result of his services; (b) an unspecified "fee" for any recovery to client, including removal of fees, liens, etc.; and (c) an hourly fee at a rate to be agreed and a percentage of the recovery for assisting any of her legal counsel.[14]  (Pl.'s Ex. 38).  Attorney Minter reviewed the Consulting Agreement, but the Morgan & Morgan lawyers did not.  Nor did Attorney Leher, who was then representing her in the MRCI lawsuit.  At trial, Attorney Leher testified that Herrera-Edwards should not have signed that agreement and that Mr. Minter did not sufficiently protect her.  (5/22 Tr. pp. 196, 205-08).

    4.   <u>Moore Takes Control</u>.

Having placed her confidence in Moore, Herrera-Edwards wanted him to be involved in her affairs, as her "strategist."  She insisted that her attorneys work with him.

Moore advised her that a Chapter 11 would be necessary; he then selected the boutique law firm of Jennis & Bowen, P.L., to be her bankruptcy counsel.  According to the debtor,

---

[14] In part, the Consulting Agreement (with emphasis added) provides:

> . . . Consultant hereby *represents to Client that he is in the unique position to collect property and/or funds on Client's behalf* and is willing to perform services on behalf of Client subject to the terms and conditions set forth below.  . . .

> Consultant will not adversely impact other rights or claims which are the subject of her current litigation.  Consultant is in possession of months of confidential information and research that may assist client in future litigation.  *Consultant agrees to assist client's legal counsel with the litigation and provide information providing the firm is willing to compensate him at an hourly rate to be agreed upon and a percentage of recovery.*  Legal counsel agrees not to interfere with Consultant's collection efforts in any way during the term of the Agreement. . . .

> COMPENSATION:  *Consultant shall be paid seventeen (17.0%) percent of funds or tangible liquid property recovered as a direct result of the Consultant's services hereunder.*  In the event Consultant's efforts should result in Client receiving tangible assets such as copyrights as part of a recovery, then the parties shall secure an independent appraisal which values the asset and Consultant's fees shall be based upon the fair market value of the asset.  *Client is due a fee for any recovery to client including but not limited to reduction or removal of fees, liens, etc.*

Moore selected Jennis & Bowen because it lacked entertainment law capabilities and, thus, could be "controlled" by him.   (7/28 Tr. p. 137-38).

Asserting his authority per Herrera-Edwards' instructions, Moore initially insisted on language being added to Jennis & Bowen's engagement letter, making him the sole contact with her bankruptcy lawyers. (7/15 Tr. p. 117).   Jennis & Bowen would not do that.   Instead, all the firm would agree to was the addition of the following to the engagement letter:   "*Moreover, pursuant to this Agreement, the Client consents and agrees that the Firm can take instructions and make communications regarding this matter from and through Eric L. Moore ("Mr. Moore")*."   (Pl.'s Ex. 186).

Attorney Leher succeeded in getting MRCI's lawsuit dismissed by the California court. He was engaged to obtain the release of the escrowed royalty payments.   Following execution of the Consulting Agreement, but before the Chapter 11, Moore commenced a series of phone calls and emails to Attorney Leher and to ASCAP's in-house counsel and others to insert himself into the effort to obtain the withheld royalty payments.   According to Moore, the "sticking point" to un-freezing these funds was MRCI's recorded UCC lien that he could get removed.  (5/22 Tr. p. 83; 5/23 Tr. pp. 255-56).

The funds were ultimately released to Attorney Leher in late August 2012.  (5/22 Tr. p. 195).   Moore then demanded payment of 17% of the released funds as being due to him under the Consulting Agreement.   He sent the debtor an invoice on September 6, 2012.  (Pl.'s Ex. 91).  She paid $44,953.53 on advice of Mr. Jennis that Moore's entitlement could be reviewed and challenged later in the bankruptcy case.  (7/15 Tr. pp. 47-49).

Asserting Herrrera-Edwards' authority, Moore directed each of her attorneys – Leher, the Morgan & Morgan lawyers, and Mr. Jennis – *not* to communicate with each other.  (E.g., 7/14

9

Tr. p. 72).  According to Herrera-Edwards, Moore frequently disparaged her lawyers' efforts. (7/28 Tr. p. 52).  Mr. Leher testified that Mr. Jennis was led to believe that Leher was "compromised" and should not be contacted; but Leher learned later that the source of that view was Moore, who had made that characterization to Herrera-Edwards. (5/22 Tr. p. 218).  The debtor testified credibly that Moore "sold" her on the feeling that her attorneys were not doing their jobs.  (7/28 Tr. p. 52).

Moore arranged a meeting at Morgan & Morgan on September 14, 2012, before the Chapter 11 filing, among himself, Herrera-Edwards, and Attorneys Darryl Rouson and Clay Townsend.  Mr. Jennis was not invited to the meeting.  Moore insisted that Morgan & Morgan reduce its contingency fee from 40% to 30% and that they retain him at $275 per hour, plus a percentage of any recovery.  Attorney Rouson described the reaction of his firm's entertainment law specialist, Clay Townsend, as "why is Moore driving the train?"  (5/23 Tr. pp. 35-36).  No fee arrangement was made.

Moore then discouraged the debtor from moving forward with the lawsuit Morgan & Morgan was ready to file.  (5/23 Tr. pp. 31-33).  Moore's rationale was that, with the Chapter 11 filing, all that would be needed was the filing of a motion for turnover of assets to cause JSM and BEC to capitulate; that would make the proposed Morgan & Morgan lawsuit unnecessary.  At the debtor's direction, based on Moore's influence, Morgan & Morgan's services were terminated by a letter from Mr. Jennis, dated October 29, 2012.  (Def.'s Ex. 65).[15]

Attorney Jennis and his colleagues instructed Moore, before the Chapter 11 petition was filed and several times thereafter, that his post-petition employment and terms of compensation must be approved by the bankruptcy court.  (Pl.'s Ex. 108; 5/23 Tr. pp. 222- 23; 7/14 Tr. pp.

---

[15]  Moore counters the inference that he sabotaged Morgan & Morgan as payback for their not hiring him by claiming that he is the one who alerted that firm to the necessity of filing a claim before the bar date.  Morgan & Morgan did file a timely claim in the amount of $173,000.

132-33; 7/17 Tr. p. 83).  On or about October 12, 2012, Attorney Tate of Jennis & Bowen so advised Moore, by email.  Moore's written and oral communications show that he understood that court approval was required.  (Pl.'s Exs. 125, 138; 5/23 Tr. p. 231; 7/17 Tr. p. 84; 7/28 Tr. pp. 83-84).

James Cinque, a prominent New York entertainment attorney, was retained, with court approval, in November 2012, to negotiate an employment agreement with Moore.  But, Moore insisted on being paid a "commission" on Herrera-Edwards' entire royalty stream, not just on any new assets found by him.  After three weeks of discussions, no agreement was reached.  No application for the employment of Mr. Moore was ever presented to this Court.  (5/23 Tr. p. 119; 7/17 Tr. p. 84).

Even though his employment was never approved by the court, Moore held himself out as the debtor's "strategist."  He continued to broadcast various theories by which he claimed to have uncovered assets, reduced fees that Herrera-Edwards owed, or eliminated claims against her estate.   (5/23 Tr. pp. 197, 260; 7/15 Tr. p. 65; 7/28 Tr. p. 52).

In November 2012, Moore sent a document request to the Connecticut probate court clerk.  He received back a certified copy of that court's order, entered on September 4, 1997, and a typed copy of the July 9, 1997, mediation settlement agreement.  (Def.'s Ex. 18).  This is what Moore has consistently referred to as the "treasure map," because, to him, it "proves" that the later-executed July 30, 1997, agreement and the Co-Publishing Agreement (which purport to give BEC all of the administration rights and allow JSM to charge certain fees) were not approved by the probate court and are therefore invalid.

Moore also took it upon himself to contact potential creditors and third parties, advising them of what claims to file or not file.  (Pl.'s Exs. 80, 106, 120, 127, 128).  In December 2012,

11

Moore contacted the U. S. Trustee's office to tell them that he had "discovered" substantial claims and funds for Herrera-Edwards that he believed were not being pursued by her attorneys. (7/15 Tr. pp. 57-58; Pl.'s Exs. 133, 150, 151).

The debtor and her attorneys became increasingly troubled by Moore's undirected activities, particularly his contact with the U. S. Trustee's Office.  With the recent knowledge of Moore's 1999 criminal conviction, the impossibility of reaching agreement for his employment, and his continued interference with counsel, Herrera-Edwards concluded that she could no longer trust him.  (7/15 Tr. pp. 57-64).  The Court approved the debtor's rejection of the Consulting Agreement on April 15, 2013.  (Doc. No. 146).

Nevertheless, Moore continued to contact Herrera-Edwards with promises of "found" money.  (Pl.'s Exs. 157, 159, 160, 161, 162, 170, 173, 174, 175a).  As late as June of 2013, Moore suggested to Mr. Jennis that he could procure either a $2.5 million loan from MRCI or a purchaser of her royalty rights for $8-12 million, for a 5% commission payable to Moore.  (Pl.'s Ex. 159).

<u>DISCUSSION</u>

1.    <u>Compensation under the Consulting Agreement.</u>

Mr. Moore argues that he is entitled to payment because he fully performed compensable services under the Consulting Agreement by discovering copyright interests (including publisher, artist, and producer shares, administration rights, and back royalties). (Claim 18, Part 2, Ex. A).  He also claims that he did copyright and probate research, put together a binder of documents, prepared charts and timelines, articulated theories of recovery, and obtained the "treasure map" from the Connecticut probate court, all of which he shared

with Herrera-Edwards and her attorneys.  He argues that his work will eventually lead to a substantial recovery for Herrera-Edwards.

It is evident that for more than a year – before they met and without her knowledge – Moore devoted considerable time to informing himself about Herrera-Edwards' financial condition, the 1997 probate case, her copyright interests, and her personal life.  He acquired documents initially through his associate, Mr. Biddle, and his contacts at MRCI and, later, from the debtor and her attorneys.  At a time when her royalty payments were being escrowed, because of a lawsuit in which he had an undisclosed financial interest, Moore promoted himself – first to Herrera-Edwards' attorney Minter, through Biddle, and then directly to the debtor herself – as being in a "unique position" to recover $500,000 or more of new money very quickly.

Under Florida law, the requirements for a claim of fraud or fraudulent inducement are (1) a false statement regarding a material fact, (2) the statement maker's knowledge that the representation is false, (3) intent that the representation induces another's reliance, and (4) consequent injury to the party acting in reliance.  *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294 (11th Cir. 2007) (citing *Wadlington v. Cont'l Med. Servs., Inc.,* 907 So.2d 631, 632 (2005).

The Court is compelled to conclude that the claim of having found $500,000 (or other new sources of money) that could be recovered quickly was a falsehood and, therefore, constitutes fraud and a false pretense.  There is nothing in the record to support that claim.  This "$500,000" has never been identified or recovered.  But, it was the critical "hook" to induce Herrera-Edwards to sign the Consulting Agreement.  The fraud is compounded by Moore's undisclosed financial interest in the lawsuit which put Herrera-Edwards in a financially

13

vulnerable position when he offered his "unique position" for a fee.[16]  The conclusion is inescapable that Herrera-Edwards and her royalty income were targeted by Moore and that he used false pretenses to induce her to sign the Consulting Agreement.

Apart from the Consulting Agreement being fraudulently induced and unenforceable, the Court concludes that Moore provided no compensable services under the document's terms. First, he did not recover any tangible liquid property.  There were never any additional "copyrights" to be recovered.  Since the 1997 settlement, Herrera-Edwards has owned a 37.5% interest in everything that Bernard Edwards once owned.  The essence of the dispute with BEC, JSM, and other parties is not whether there are copyrights to be found, but whether these intermediary payors have faithfully disbursed the proper amounts to her and whether any fees taken out of the royalties are warranted by the parties' agreements.

Second, Mr. Leher testified that he had identified the nature of possible royalty shortfalls in 2010, before Moore was involved.  Morgan & Morgan was retained in November 2010, also before Moore became involved.  Morgan & Morgan was prepared in 2011, before the Consulting Agreement was signed, to assert claims to recover the artist, producer, and other royalties that apparently had not been paid to Herrera-Edwards.  (5/23 Tr. pp. 24-29).

Mr. Rouson testified, convincingly, that Moore provided no value to Herrera-Edwards.  ("I didn't see [Moore] do anything.").  (5/23 Tr. p. 73).  Likewise, Mr. Cinque regarded Moore as providing no value to Herrera-Edwards.  (5/23 Tr. p. 188).  According to Herrera-Edwards, who testified credibly, the binder of Moore's work that he delivered to Jennis & Bowen consisted of her own documents.  (7/15 Tr. pp. 65-67).

---

[16] In light of the foregoing, Moore's protest that Herrera-Edwards could have learned of his 1999 felony conviction by a Google search is of no consequence.

Moore's "treasure map" provides no value.  The certified copy of the probate court's order, entered on September 4, 1997, and the typed copy of the July 9, 1997, mediation settlement agreement proves only that those documents are in that court's files, a fact which nobody disputes.  (5/23 Tr. p. 251).  But, it is nothing short of far-fetched to suggest that two agreements (the July 30, 1997 Agreement and the Co-Publishing Agreement), executed by well-represented parties, are invalid solely because they post-date the July 9 agreement which contemplated (Paragraph 9) that subsequent agreements would be made by the parties.

Herrera-Edwards retained Attorney Leher to represent her in the MRCI litigation (5/22 Tr. p. 192), and, as Herrera-Edwards' attorney in that lawsuit, it was Attorney Leher's responsibility to obtain the release of the withheld royalty payments.  He and his firm succeeded in having the MRCI lawsuit dismissed; Leher corresponded with MRCI's counsel, counsel for JSM and BEC, and counsel for ASCAP regarding the escrowed royalties.  (Pl.'s Exs. 83, 87).  The escrowed funds were released to Leher.  (5/22 Tr. p. 195; Pl.'s Exs. 86, 87).

Even though Moore inserted himself into the process, there is no proof that Moore's efforts contributed anything to what Attorney Leher was already doing to obtain the funds.  Further, these funds were historical royalties that Herrera-Edwards would have received in the ordinary course if MRCI had not sued her payors.  They were not from any new source that Moore discovered in his capacity as her "consultant."

Based on the admitted evidence, as well as credible testimony at trial, the Court finds that Moore's other claims of recovery are equally valueless.

1.    *Moore claims that he removed MRCI's lien on the debtor's royalties following the failed MRCI loan transaction.*

Moore testified that he is the one who "persuaded" MRCI to terminate its lien by telling MRCI's principals that "this is illegal and we'll file charges if you don't remove it." (5/22 Tr. p. 83). But he discouraged Herrera-Edwards from taking any legal action against MRCI. (5/23 Tr. pp. 255-56; 7/14 Tr. p. 169). The MRCI "loan" closing never occurred; MRCI never funded the loan that was to be secured by the lien.[17] Because the loan was never funded, there was no consideration for the lien. There was no legal basis for the continuation of the lien, which could have been avoided in the bankruptcy case. Moore contributed nothing of value in this matter.

2.    *Moore claims that he persuaded Lyric Financial not to file a claim in the bankruptcy case.*

Counsel for Herrera-Edwards scheduled a debt to Lyric Financial based on information provided by Moore or Herrera-Edwards' accountants. (5/23 Tr. pp. 256-57). However, Lyric Financial acknowledged to Herrera-Edwards' bankruptcy counsel that it had already been paid in full. (Pl.'s Ex. 116). Moore accomplished nothing by "persuading" Lyric Financial not to file a claim in the bankruptcy case.

3.    *Moore claims that he persuaded the debtor's probate case attorneys, Ryan Ryan Deluca, not to file a claim in the bankruptcy case.*

Moore contacted Ryan Ryan Deluca repeatedly, but they refused to deal with him. (Pl.'s Ex. 127). Ryan Ryan Deluca informed Moore that it would only communicate with Herrera-Edwards' bankruptcy counsel. (5/23 Tr. p. 257). When Herrera-Edwards' bankruptcy counsel contacted Ryan Ryan Deluca to obtain their probate case files, they were advised that that Ryan Ryan Deluca was not asserting a retaining lien on the files and would not be filing a bankruptcy

---

[17]    The MRCI contract defined the "Closing" as the time when "[t]he Purchase Price shall be paid." (Pl.'s Ex. 23, ¶ 2.a). While the contract provided for payment of $50,000 in "due diligence and closing costs and charges," such payment was to be made in connection with the Closing, with MRCI having the right to deduct the amount from the Purchase Price. (*Id.* ¶ 8).

claim.  (5/23 Tr. p. 257).  Again, Moore did nothing to "persuade" Ryan Ryan Deluca not to file

a claim.  That firm had refused to communicate with him and never intended to file a claim.

   4. *Moore asserts that the debtor has a claim against Ryan Ryan*
*Deluca of more than $1,000,000 under a contingency fee agreement for the tort*
*lawsuit that resulted in the 1997 settlement.*

  There is no evidence that Ryan Ryan Deluca owed the debtor anything on the petition

date.  The Ryan Ryan Deluca 1997 contingency fee agreement was expressly made "subject to"

the Connecticut statutory limitation on contingency fees.  (Pl.'s Ex. 10, MOORE, Bates stamp

000098-100).  Accordingly, the fees due to that firm, by contract, could not exceed or violate the

statutory cap.  Years later, Herrera-Edwards settled her fee issues with Ryan Ryan Deluca and

executed a general release of any claims against the firm.  (Pl.'s Ex. 10, MOORE, Bates stamp

000108).  Accordingly, Herrera-Edwards did not have a valid "million dollar" claim against

Ryan Ryan Deluca.

   5. *Moore asserts that he discovered a $160,000 spousal share of the*
*Edwards' estate that was never paid to her.*

  The $160,000 spousal share would have been due and payable prior to the closing of the

probate estate, long before Moore was involved.  Herrera-Edwards' entitlement to the spousal

share was expressly acknowledged in the 1997 settlement.  (Pl.'s Ex. 5, p. 2).  The succession tax

assessment, prepared some 15 years ago, reflects her receipt of the payment.  (Def.'s Ex. 49,

Doc. 374-5, p. 4).  At trial, Herrera-Edwards was unable to confirm that she had not received the

payment.  (7/28 Tr. p. 72).

      *6.     Moore maintains that Herrera-Edwards can eliminate her IRS liability by taking a "theft loss" tax deduction for royalty underpayments.*[18]

Tanisha Mills, a CPA, testified for Moore that she was of the opinion that a potential theft loss deduction could be taken based on (1) an overpayment of fees to Ryan Ryan Deluca, (2) the 5% fee that JSM deducts from her royalties, and (3) the "theft" of Herrera-Edwards' copyright interests by JSM, BEC, and others.  (7/17 Tr. pp. 113, 128, 137).  Mills relied entirely on the factual information provided by Moore.  (7/17 Tr. pp. 115, 117-20).  She never discussed the underlying facts with Herrera-Edwards or her accountants.  (7/17 Tr. pp. 117-20, 131, 137-38).

But, it has not yet been established that royalties were underpaid, or that any of the upstream payors have engaged in criminal conduct.[19]  These claims, however, are the subject of pending civil litigation seeking a money judgment for compensatory damages.  Where there is "a claim for reimbursement with respect to which there is a reasonable prospect of recovery," the taxpayer has not sustained a loss until "it can be ascertained with reasonable certainty whether or not such reimbursement will be received."  26 CFR §1.165-1(d)(3).  Any contention that Herrera-Edwards has sustained a theft loss related to alleged underpayments is premature.[20]

Second, "[i]f the theft is accomplished in a manner that results in the taxpayer failing to include the cash or property in income, or in claiming the amount of the loss as a business

---

[18]  Although not pleaded in Claim 18, Moore implied at trial that he was entitled to payment for presenting his theory that Herrera-Edwards was entitled to a theft-loss deduction to reduce or eliminate her federal tax debt.

[19]  For purposes of a deduction under 26 U.S.C. § 165(a), "theft" covers "any criminal appropriation of another's property to the use of the taker, particularly including theft by swindling, false pretenses, and any other form of guile."  *Edwards v. Bromberg*, 232 F.2d 107, 110 (5th Cir. 1956) (emphasis added); Revenue Ruling 72-112 (taxpayer must prove "loss resulted from a taking of property that is illegal under the law of the state where it occurred and that the taking was done with criminal intent").

[20]  Moore also asserts that Ryan Ryan Deluca stole from the debtor when it overcharged attorney's fees.  The statute he relies on, Connecticut General Statutes § 52-251c, is a civil statute.  The statute does not make it "illegal" or a "criminal act" to exceed the statutory caps, and it does not provide for punishment under the state penal code.  Further, as noted above there is no proof that the Connecticut statute was violated.

expense, no theft loss will be allowed."[21]  There has been no proof that Herrera-Edwards did not deduct the attorney's fee payments she made to Ryan Ryan Deluca.  It is also unlikely that she included the unknown amount of unpaid royalties in her reported income.

Moore's theft loss deduction strategy is not realistic.  Herrera-Edwards' special tax counsel, Mr. Heinkel, was employed to investigate the theft loss deduction being asserted by Moore.  Mr. Heinkel determined that a theft loss deduction was inappropriate at this time, given the debtor's situation.  (5/23 Tr. p. 259-60).

Instead of limiting or reducing the debtor's liabilities, Mr. Moore substantially hindered the administration of, and increased the claims in, the Chapter 11 case:

    (a)  Mr. Jennis estimated that to maintain Herrera-Edwards' trust some $300,000 of attorney time was expended to analyze and advise her regarding Mr. Moore's theories.

    (b)  His disparagement of the attorneys, while advising them not to consult with each other led to wasteful duplication of effort.

    (c)  Moore's unauthorized and, ultimately ineffectual, effort to dissuade Ryan Ryan Deluca from filing a bankruptcy claim could have been a significant blunder; if it had turned out that the debtor did have a claim against that firm, the filing of a proof of claim might have provided the legal basis for adjudicating her claim against them in the bankruptcy court in Tampa.[22]

    (d)  Herrera-Edwards was compelled to deploy Mr. Cinque to work for three weeks to negotiate a post-petition employment agreement, which failed because Moore insisted on a percentage commission on historical royalties not just on new assets recovered through his efforts.

    (e)  Moore takes credit for encouraging Morgan & Morgan to file a $173,000 claim in the bankruptcy case.

---

[21]  BNA U.S. Income Portfolio, McCoy, 527-4th T.M., Loss Deductions, p. 298 (2014); *Alsop v. Commissioner*, 290 F.3d 726, 727-29 (2d Cir. 1961) (embezzled royalty payments which were never reported as income by a cash basis taxpayer had a zero basis and thus could not be claimed as a theft loss); *U.S. v. Spencer*, 178 F.3d 1365, 1369 (10th Cir. 1999); *U.S. v. Kleifgen*, 557 F.2d 1293, 1298-99 (9th Cir. 1977); *Martin Gluck & Sons, Inc. v. U.S.*, 1977 WL 1088, at *1-2 (W.D. Pa. 1977).

[22]  See *Stern v. Marshall*, 564 U.S. 2, 131 S.Ct. 2594, 2616-19 (2011) (Justice Roberts' analysis of bankruptcy court's authority to adjudicate a counterclaim based on facts that overlap a proof of claim).

Third, none of the debtor's attorneys ever agreed to hire or compensate Moore.  (5/22 Tr. p. 202; 5/23 Tr. pp. 37, 119, 217).  Moore never requested an agreement with Jennis & Bowen.  (5/23 Tr. p. 217).  Draft applications for employment by the bankruptcy estate were prepared, but never signed or filed.  (Def.'s Exs. 15, 41; 5/23 Tr. pp. 225-26, 229).  Moore had earlier attempted, without success, to negotiate an employment agreement with Morgan & Morgan, and he prepared a draft amendment to their retainer agreement (5/23 Tr. pp. 34-35; Def.'s Ex. 11); but Morgan & Morgan never signed the amendment, and did not agree to compensate him.  (5/23 Tr. p. 37).

For the reasons stated above, the Court concludes that the Consulting Agreement, procured by fraud or false pretenses, is invalid.  The Court concludes, as well, that Moore has not provided any services which would be compensable under the Consulting Agreement even if it was valid.  Mr. Moore's Claim No. 18 will be disallowed in its entirety, with prejudice.  Mr. Moore will not be allowed any damage claim arising out of the rejection of the Consulting Agreement.  And, judgment will be entered against him on his counterclaim.

2.    Administrative Expense Claim.

Sections 327 and 330 of the Bankruptcy Code govern the employment and compensation of professionals.  Specifically, section 327 authorizes a trustee (or debtor-in-possession), with bankruptcy court approval, to employ certain named professionals, including attorneys, appraisers, and "other professional persons."  11 U.S.C. § 327(a).  Section 330(a) allows an award to a professional person employed under section 327, for reasonable compensation and actual, necessary expenses.  11 U.S.C. § 330(a)(1)(A) & (B).

The term "professional" is not limited to licensed individuals, but is to be defined more generally. For example, in *In re Interstate Restaurant Systems, Inc.*,[23] the court employed a functional test to determine whether someone is a professional ("[w]hether services rendered are sufficiently 'professional' in nature does not turn solely on the type of educational degree that one possesses . . . . Rather, this Court holds that services of a 'professional' nature are manifested by workmanship based on sound knowledge and conscientiousness. This sound knowledge can be acquired through the results of education, training or experience.")

Even though Moore is not a "professional," by education or credentials, he held himself out as being an expert on the financial workings of the music industry. He claimed to the debtor and her lawyers to possess exclusive knowledge that put him in a "unique position" to recover "hidden" funds and other assets owed to the debtor, for which he wanted compensation based on a percentage of estate assets. In addition to his claims of expertise and private knowledge, Moore held himself out as a professional consultant. In the "bio" he sent to several of Herrera-Edwards' attorneys, Moore advertised himself as the President and Founder of Moore Consulting, while plugging his experience as both a "consultant" and "bankruptcy consultant." Because Moore sold himself as having the attributes of a professional person, he cannot now disavow that status for purposes of Sections 327, 330, and 503(b)(2). [24]

---

[23]  61 B.R. 945, 949 (Bankr. S.D. Gla. 1986).

[24]  In his Request for Judicial Notice (Doc. No. 53), Moore points to a statement made in Herrera-Edwards' trial brief, that Moore "is clearly not a professional." (Doc. No. 28 at 25). Moore asks the Court to take judicial notice of this statement in an attempt to counter a finding by the Court that Moore is a "professional" for purposes of Sections 327 and 330, or an administrative expense claim under Section 503(b)(2). However, those references are made in more of a vernacular sense, not a technical sense, and the status of a "professional" is based on the attributes of the applicant, services to provided, and terms of compensation.

21

Pursuant to Sections 327 and 330 of the Bankruptcy Code, Moore's employment and terms of compensation had to be approved by the Court for Moore to receive compensation from the estate.

But, his employment was never approved. Moore claims that he reasonably relied on Herrera-Edwards' promises to continue working under the terms of the Consulting Agreement and that he delivered his work product to Herrera-Edwards and her legal counsel until January 1, 2013.[25] He asserts that he was misled by Herrera-Edwards, Mr. Jennis, Ms. Tate, and others – who took his work product, but then denied him employment by the estate. He claims that this is an "extraordinary circumstance" that excuses him from prior court approval.[26]

There is no evidence, however, that Moore was misled, abused, or improperly influenced by the debtor, Mr. Jennis or his colleagues, or any of her other attorneys regarding his employment. Moore was advised repeatedly that his employment would have to be approved by this Court for him to be paid.[27] Even in the absence of approval – indeed even after rejection of the Consulting Agreement – Moore voluntarily pushed his theories and proposals on Herrera-

---

[25] In the main bankruptcy case, the debtor initially opposed Moore's administrative expense claim (Doc. No. 221) by filing a motion for summary judgment on the premise that Moore was ineligible because his employment had never been approved by the court (Doc. No. 276). Although the debtor's motion was premised on well-established law regarding the pre-requisite of court approval, the Court denied it (Doc. No. 328) because Moore raised a plausible claim that he had been misled by Jennis & Bowen into providing services without compensation. Moore argued that such misconduct could be an "extraordinary circumstance" excusing prior court approval. Motion for Reconsideration (Doc. No. 274).

[26] In *In re United Container, LLC*, 305 B.R. 120 (Bankr. M.D. Fla. 2003), Judge Glenn acknowledged that courts generally agree that the employment of a professional must be approved, but may be made effective retroactively, provided that extraordinary circumstances are present in the case. (citing *In re Aultman Enterprises,* 264 B.R. 485, 489 (E.D. Tenn. 2001); see also *In re Little Greek Restaurant, Inc.,* 205 B.R. 484, 486–87 (Bankr. E.D. La.1996) ("[B]ankruptcy courts retain equitable powers, in the exercise of their sound discretion, under exceptional circumstances, to grant such approval nunc pro tunc.")).

[27] Moore seeks to legitimize his claim to have been working for the estate by the several references to him in the debtor's schedules, in motions, drafts of employment applications, letters, e-mails, and Jennis & Bowen's engagement letter. On October 18, 2012, Moore was listed by name in the Case Summary (Doc. No.14) as someone to be hired on an expedited basis. Moore was also listed on Schedule G/Executory Contracts. See Debtor's Schedule (Doc. 5, pg. 103-104). None of those references to him has any legal significance because this Court was never presented with an application to employ him to work on behalf of the estate.

Edwards and her legal team.  The Court concludes that there are no "extraordinary"
circumstances" excusing Moore from the requirement of prior court approval.

Alternatively, Moore argues that he is entitled to an administrative expense claim for his
services, without court approval, under Section 503(b)(1)(A) of the Bankruptcy Code as a
necessary cost of preserving the estate.  This Court finds compelling, however, the majority view
of courts that Bankruptcy Code Section 503(b)(1)(A) is not to be used by unapproved
professionals to avoid the requirements of section 503(b)(2) and the related obligations under
sections 327 and 330(a).[28]  This Court will not allow Mr. Moore to "sidestep" the provisions of
the Code mandating court approval of a professional's term of employment, particularly so,
where he held himself out as being a uniquely qualified consultant and demanded compensation
at a double-digit percentage of the estate's principal asset.  For this reason, Moore's argument of
entitlement to fees under section 503(b)(1)(A) fails.

Beyond the fact that his employment and compensation were not approved by the Court,
there is another reason to deny an administrative expense claim.  For a claim to be afforded
administrative expense priority, it must not only be "actual" and "necessary," but also "there
must be an actual, concrete benefit to the estate before a claim is allowable."  *In re Subscription*
*Television of Greater Atlanta*, 789 F. 2d 1530, 1532 (11th Cir. 1986).  For the reasons stated
above, the Court has determined that Mr. Moore provided no benefit to the bankruptcy estate.

---

[28] See *F/S Airlease II, Inc. v. Simon (In re F/S Airlease II, Inc.),* 844 F.2d 99, 108–09 (3d Cir. 1988); *In re Albrecht,*
245 B.R. 666, 670–71 (10th BAP 2000), *aff'd*, 233 F.3d 1258 (10th Cir. 2000); *In re Cutler Mfg. Corp.*, 95 B.R 230,
231-32 (Bankr. M.D. Fla. 1989) ("As Judge Brumbaugh stated in *In re Martin Oil Company,* 83 B.R. 50
(Bkrtcy.D.Colo., 1988), 'The Bankruptcy Code contains numerous and detailed provisions concerning the
employment of professional persons and their compensation and payment:  See 11 U.S.C. § 327, § 328, § 330 and §
503(b)(2).  In light of these provisions, Congress cannot have intended that a professional person could sidestep the
specific requirements set forth and come in later and claim payment under the general provisions of § 503(b)(1)(A)
as an actual, necessary cost of preserving the estate. . . . .;' *Matter of Concrete Products, Inc.*, 208 B.R. 1000 (Bankr.
S.D. Ga. 1996) ("To apply Section 503(b)(1) to professional compensation would make the language of Sections
503(b)(2) superfluous. Congress enacted Sections 327, 330(a), and 503(b)(2) to provide the exclusive method for a
debtor's retention of professionals, subject to numerous safeguards, including the requirement of disinterestedness.
A court should not circumvent the limitations placed on retention of professionals by compensating a disqualified
professional under Section 503(b)(1)(A)."); *In re Villa Luisa, L.L.C.*, 354 B.R. 345 (Bankr. S.D. N.Y 2006).

His strategies and theories of the case did not contribute to the recovery of any asset. They were proved to be without merit and lacking evidentiary support. His involvement actually hindered the administration of the case and caused legal resources to be deployed in efforts to verify his theories, maintain the debtor's confidence in the face of those theories, and negotiate with Moore regarding his desired commission.

The Court is compelled to conclude that Mr. Moore is not entitled to an administrative expense claim because he was never appointed by the Court, the terms of compensation were never approved, and he provided no benefit to the bankruptcy estate.

3.      Quantum Meruit:

Lastly, Moore asserts that he is entitled to recover compensation under a claim of *quantum meruit*. Under Florida law, any party seeking a *quantum meruit* claim must show that they provided, and the counter-party assented to and received, a benefit in the form of goods or services under circumstances where, in the ordinary course of common events, a reasonable person receiving such a benefit normally would expect to pay for it. *Babineau v. Federal Exp. Corp.*, 576 F.3d 1183 (11th Cir. 2009). Moore's initial retention by Herrera-Edwards in July 2012 was induced by fraud. Mr. Moore's efforts thereafter did not contribute anything of value to the debtor or to the estate. He used information provided to him initially by third parties, without Herrera-Edwards' knowledge. He seeks credit for the work of attorneys employed by the debtor (Leher). Otherwise, his efforts were of no value and actually hindered the administration of the case. For these reasons, he is not entitled to a *quantum meruit* claim.

4.    <u>Unjust Enrichment:</u>

In Count II, Herrera-Edwards asserts a claim for damages based on being fraudulently induced to enter into the Consulting Agreement.  She asks that monies paid to Moore under the Consulting Agreement leave Moore unjustly enriched.

Under Florida law, "[a] claim for unjust enrichment has three elements: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendant[ ] to retain it without paying the value thereof."  *Lesti v. Wells Fargo Bank, N.A.*, 2013 WL 6095441, *4 (M.D. Fla., Nov. 20, 2013) (quoting *Virgilio v. Ryland Grp., Inc.,* 680 F.3d 1329, 1337 (11th Cir.2012) (citations omitted)).

In this proceeding, the elements for a claim of unjust enrichment are easily established. After ASCAP's release to Mr. Leher of the escrowed $265,000, Moore demanded payment of 17% of the released funds as being due to him under the Consulting Agreement.  He sent the debtor an invoice on September 6, 2012.  Herrera-Edwards did not believe she owed Moore any fee on the release of these historical royalties; but, Moore – whom she trusted as her "strategist" – was calling and emailing her for payment.  (7/15 Tr. pp. 47-48).  She only paid Moore after bankruptcy counsel advised that the payment could be reviewed and challenged later.  (7/15 Tr. pp. 47-49).

Because the funds were released as direct result of Attorney Leher's efforts, not Moore's (5/22 Tr. pp. 194-95), and because these were historical royalties that already belonged to Herrera-Edwards, Moore was not entitled to compensation under the terms of the Consulting Agreement.  Beyond that, the Consulting Agreement, pursuant to which he demanded payment,

was induced by his fraud.  Therefore, Herrera-Edwards has established the elements of an unjust enrichment claim.  It is inequitable for Moore to keep the fees he unjustly demanded and accepted.

CONCLUSION

Having learned of Herrera-Edwards' difficulties through Mr. Biddle and MRCI, Mr. Moore spent considerable effort informing himself about her financial affairs long before they met.  Then, while her cash flow was severely diminished, he sold her on his "unique position" to find new money for her, based on the false statement that he could recover $500,000 or more very quickly.  Mr. Moore had an undisclosed interest in the very MRCI lawsuit that was causing her historical royalties to be withheld.  He failed to disclose his prior felony conviction.  For these reasons, the Consulting Agreement was induced through fraud and is invalid.  There is no entitlement to compensation thereunder or for rejection damages.

None of Mr. Moore's efforts provided any benefit to Herrera-Edwards or the bankruptcy estate.  He did not find or recover any assets she did not already own or that her attorneys were not working to recover.  Moore's "treasure map" is little more than a theatrical prop.  Mr. Leher's efforts were the necessary and sufficient cause of the release of her escrowed royalties.

Mr. Moore was never appointed by the Court, not because of false promises by Herrera-Edwards or her attorneys, but because of the unreasonable terms of compensation he demanded. His efforts actually undermined the administration of the estate.

For these reasons, all of Mr. Moore's claims will be disallowed, with prejudice.

Judgment will be entered for the debtor on all counts of her complaint; judgment will be entered against Mr. Moore on his counterclaim.

January 29, 2015

DONE and ORDERED in Chambers at Tampa, Florida, on _____.

_____
K. RODNEY MAY
United States Bankruptcy Judge

Clerks' office to serve

27